42 A.3d 12

### HNS DEVELOPMENT, LLC

v.

### PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.

No. 85, Sept. Term, 2011.

Court of Appeals of Maryland.

April 23, 2012.

---

16. *E.g., Attorney Grievance Comm'n v. Calhoun,* 391 Md. 532, 570, 894 A.2d 518, 541 (2006).

John B. Gontrum (Jennifer R. Busse of Whiteford, Taylor, Preston, LLP, Towson, MD), on brief, for petitioner.

Peter Max Zimmerman, People's Counsel for Baltimore County (Carole S. DeMilio, Deputy People's Counsel, Towson, MD), on brief, for respondents.

J. Carroll Holzer (Holzer & Lee, P.A., Towson, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

HARRELL, J.

This case presents a cautionary tale of a protracted struggle pitting asserted development rights against the Baltimore County Master Plan. The saga began in 1991 when the predecessor in title to the subject property to the Petitioner, HNS Development, LLC ("HNS"), and the County government failed to resolve conclusively whether certain development restrictions would be placed on parcels including and adjacent to the historic Langenfelder Mansion in Kingsville, Maryland. The "restrictions" under consideration implicated preservation of the Mansion's historic character and the scenic view of it from Bel Air Road. During the review process of the development plan for what became the Longfield Estates subdivision, the County, in light of textual recommendations expressed in the extant Master Plan regarding protection of scenic views, required easements for certain parcels in the subdivision to protect the view of the Mansion, but stopped short of establishing the same provisions with regard to two proposed parcels containing and immediately adjacent to the Mansion. Instead of easements or other forms of clear restrictions on development of these two parcels, the County Office of Planning requested that a note be placed on the development plan indicating that the Office of Planning would not support further development on the two parcels because to do so would be in conflict with the Master Plan. Thus, the plat note deferred indefinitely the resolution of what, if any, development might be allowed on the portion of the subdivision surrounding and including the Mansion. The original developer did not contest ultimately imposition of the requested plat note. Time has not cleared the muddied waters.

HNS purchased in 2004 the subject two parcels, comprising a total of 13 acres, surrounding the Mansion after develop-

ment of the remainder of Longfield Estates. HNS acquired the parcels with knowledge of the cautionary note on the 1991 development plan. After having its proposed amended development plan (which sought to subdivide the lot containing the Mansion into two parcels and to place a dwelling on one of those lots and another dwelling on the parcel adjacent to the Mansion) rejected by three county agencies, the Circuit Court for Baltimore County, and the Court of Special Appeals, HNS asks this Court to conclude that its amended development plan meets the applicable development regulations of the Baltimore County Code and ignore the conceded Master Plan conflict, the latter continuing through the current Master Plan. Respondents, People's Counsel for Baltimore County ("People's Counsel") and the Greater Kingsville Community Association ("GKCA"), argue that the Master Plan conflict provides a stand-alone basis for the County to reject the proposed amended development plan. We agree with Respondents.

## I. FACTS AND ANTECEDENT ADMINISTRATIVE AND JUDICIAL PROCEEDINGS

Ann Langenfelder owned a 194–acre farm, containing a historic mansion, in Kingsville, Maryland. She sold the majority of the farm to the Longfield Estates Development Corporation ("LEDC"), but retained 13 acres comprised of two parcels, one containing the Mansion (Lot 42) and one adjacent to the Mansion (Parcel A).[1] In 1990, the Baltimore County Review Group ("CRG")[2] approved Phase I of the Longfield Estates development. Phase II of the development was delayed and, when submitted for consideration, referred to the County Planning Board because of a perceived conflict between the development proposal and the extant version (1989–

---

**1.** The lot and parcel numerical designations are as identified in the 1991 development plan for Phase II of Longfield Estates.

**2.** The County Review Group came into being in 1982 as a government body to review land development plans. Until a recent change in the Baltimore County Code, amendments to plans approved previously by a CRG were to "be reviewed and approved in the same manner as the original plan." Baltimore County Code (B.C.C.) § 32–4–262 (2008).

2000) of the County Master Plan.[3] The conflict centered on the scenic objectives of the Master Plan's recommendations to protect the historic Langenfelder Mansion, also known as Rockwood.[4]

After reviewing the potential Master Plan conflict, the Planning Board recommended that the CRG approve Phase II of the development, but under conditions that altered the location and configuration of some lots and restricted house siting and landscaping on nine lots as a means to maintain the scenic view from Bel Air Road to the Langenfelder Mansion. The nine lots targeted by the Planning Board were empressed with restrictive covenants to ensure that the historic viewshed was maintained. Despite the Planning Board's conclusion that the nine lots (as proposed by the developer) were in conflict with the Master Plan, it recommended that the County not acquire the properties, which, had the recommendation been to place the land in reservation, may have foreclosed any development on the nine lots and set up a significant show-down with LEDC. Lot 42 and Parcel A were retained by Ann Langenfelder, while the remaining 181 acres (owned by LEDC) were subdivided for single-family residential lots with the restrictive covenants. No definitive restrictive covenants were placed on Lot 42 or Parcel A; however, the following Note 18 was placed on the approved Phase II final development plan:

The Baltimore County Office of Planning & Zoning would not support future development on Lot 42 or Parcel "A". Any future subdivision of Lot 42 and/or Parcel "A" would be considered a conflict with the Master Plan as detailed by the Planning Board's decision. Lot 42 as shown on the revised CRG Plan is designed in accordance with the Planning Board's action of January 17, 1991. Furthermore, the

---

3. For an explication of the conflict, *infra* note 11.

4. The Langenfelder Mansion was not included on the County's list of historic properties by the Baltimore County Landmarks Preservation Commission until 1996. Its inclusion was due, in part, to the advocacy of the GKCA.

Office of Planning and Zoning supports and strongly encourages the applicant to seek a conservation easement to restrict future development on Lot 42 and Parcel "A" to permanently protect the integrity of the scenic view.

Phase II of the development plan was approved by the CRG, as recommended by the Planning Board, in 1991 and the development was built-out over the ensuing years.

In 2004, Ann Langenfelder died. Her estate sold Lot 42 and Parcel A to HNS, owned by Mark Storck. Storck was aware of the 1991 Phase II final development plan's Note 18. Later in 2004, HNS applied for a building permit to erect a dwelling on Parcel A. The Planning Board rejected the building permit as a "clear violation of the approved plan," relying on Note 18 as support for this position. In 2005, HNS submitted an amended development plan to the CRG, proposing to subdivide Lot 42 into two lots, one for the Mansion and one for a new dwelling, as well as a dwelling on Parcel A. The amended plan was accepted for filing by the CRG on 17 February 2005. Pursuant to B.C.C. § 22–56(b) (1987, 1988–89 Supp.),[5] the County Department of Public Works ("DPW") had 30 days after the proposed amended plan was accepted to schedule a meeting of the CRG to consider the proposal.

Prior to the CRG meeting on the proposed amended plan, the Planning Board submitted comments that reiterated its view that Note 18 prohibited development on Lot 42 and Parcel A because, if the parcels were developed or resubdivided, a conflict would arise with the Master Plan, as determined by the Planning Board in 1991. The CRG meeting was not convened until 1 April 2005. At the meeting, HNS argued that the statutory deadline in B.C.C. § 22–56(b) for holding the CRG meeting (within 30 days of the filing of the amended plan) had passed and, therefore, B.C.C. § 22–47 provided that the amended development plan should be "deemed approved"

---

5. The B.C.C. was recodified after the original approval in 1991 of the Longfield Estates development. All B.C.C. references hereafter are to the 1988–89 Supplement to the 1987 Code (the prevailing Code in 1991), unless otherwise noted. ·

by the CRG.[6] The CRG rejected this argument and denied HNS's amended development plan, in light of the Planning Board's comments. Notwithstanding this seeming "victory," People's Counsel and GKCA, both of which opposed approval of the amended plan, filed "protective" administrative appeals with the County Board of Appeals, presumedly because of HNS's contention regarding the "deemed approval" for failure to conduct timely the CRG hearing. A short time later, HNS appealed to the Board of Appeals the CRG's denial of the amended development plan.

The Board of Appeals held six days of public hearings between 19 October 2005 and 22 August 2006, culminating with a public deliberation on 9 November 2006. On 6 April 2007, the Board of Appeals issued a written opinion remanding the matter to the Planning Board for further review in determining the meaning and effect of Note 18 in relation to the amended development plan and whether a Master Plan conflict continued. The Board of Appeals retained jurisdiction over the case in order to make a decision on the merits after the Planning Board reached its decision on remand. The Board of Appeals explained that, although its review was de novo (according to Baltimore County Charter § 603), because the CRG failed to request that the Planning Board make a further determination whether a conflict existed between the proposed amended development plan and Master Plan, "a crucial piece of evidence" was missing.[7] The Board of Appeals

---

6. B.C.C. § 22–47 states:

> If any county agency fails to act on any plan or plat submitted in accordance with these regulations within the prescribed time, the plan or plat shall be deemed to have been excused by the administrative officer, in writing, no later than seven (7) days after the expiration of the prescribed time.

7. Although it is to some extent conjecture (because the Board of Appeals's explanation was a tad obscure), we infer that the specific premises for remand were: (1) that the Planning Board's pre-CRG-hearing comments were not in response to a formal referral to it by the CRG; and (2) that the pre-CRG-hearing comments by the Planning Board did not elaborate whether the Master Plan conflict continued

believed apparently (despite the Planning Board's submission of comments prior to the 1 April 2005 CRG meeting) that it could not decide properly the appeal without a formal referral to and response from the Planning Board to determine whether a conflict existed currently.

The Board of Appeals's opinion addressed also the question of which of the appealing parties bore the burden of showing that the CRG's action was arbitrary and capricious, procured by fraud, or otherwise illegal. B.C.C. § 22–61(c). People's Counsel argued that HNS waived its argument under B.C.C. § 22–47 that the amended plan was "deemed approved" because HNS had not raised the claim on or before expiration of the statutory deadline for the CRG hearing to be held. The Board of Appeals rejected this argument, concluding that B.C.C. § 22–56 provided clear time frames and it was not the developer's responsibility to compel the CRG to act timely. Based on this conclusion, the Board of Appeals determined that the People's Counsel and GKCA bore the burden of proof on this issue on appeal.[8] People's Counsel and GKCA filed motions for reconsideration, arguing that the Board of Appeals erred procedurally by ordering a remand of the matter directly to the Planning Board (rather than to the CRG) and by retaining jurisdiction during the remand. All of the parties argued that the proper procedure for the Board of Appeals was to have remanded directly the matter to the CRG with instructions to refer the question of the Master Plan conflict to the Planning Board. The Board of Appeals disagreed and the revisory motions were denied.[9]

On remand, the Director of the Planning Board, Arnold "Pat" Keller, prepared a report for the Board of Appeals, concluding that the proposed amended development plan conflicted with the 1989–2000 and 2010 Master Plans. The Plan-

---

under the 2010 Master Plan, explicating its comments only in terms of the Master Plan in place in 1991.

8. We are not called upon in this case to fathom why this was so.

9. Likewise, we are not asked here to opine on this point.

ning Board adopted Director Keller's report and concluded that no further subdivision or development were allowed on Lot 42 or Parcel A. Pursuant to B.C.C. § 22–18(b), the Planning Board forwarded its decision to the County Council on 28 April 2008, but did not recommend that the Council take any action to reserve or acquire the property. The County Council took no action, either to disagree with the determination of a Master Plan conflict or to reserve the property.[10] Receiving no response from the County Council, the Planning Board sent its findings to the Board of Appeals.

HNS requested a hearing before the Board of Appeals, which was held on 17 December 2008 and 5 February 2009. On 1 July 2009, the Board of Appeals issued an order and opinion affirming the Planning Board's decision that the amended development plan conflicted with the Master Plan and should not be approved.[11] The opinion observed that the

---

**10.** B.C.C. § 22–18(b) requires that the Planning Board determine "whether or not it believes that it would be in the public interest to reserve any portion or all of the land involved in" a proposed development plan (original or amended) and forward that recommendation to the County Council. In its report to the County Council, the Planning Board recommended *against* reservation.

**11.** B.C.C. § 22–37(a), a part of the County Code governing development policies, requires that "[a]ll development of land must conform to the master plan." In a 7 January 1991 memorandum from the then director of the Office of Planning and Zoning to the Planning Board, the Master Plan conflict was described as follows: Longfield Estates was within the designated Kingsville–Fork "rural protection land use areas" and the Master Plan directed the County to "protect existing visual elements in new development in rural protection areas." The 1989–2000 Master Plan stated that "the primary intent of the Master Plan for rural areas is that new development be very carefully adjusted to the visual and environmental character of the area," and that "[d]evelopment of houses in the centers of fields and the clearing of woodlands for houses would dramatically and irreparably damage the visual character of the entire area."

In a 20 February 2008 memorandum to the Planning Board, Director of the Office of Planning, Pat Keller, described the conflict with the 2010 Master Plan which "reinforces the goal of earlier master plans to protect agriculture and sensitive environmental areas of the rural county from development encroachment." The memorandum stated that the 2010 Master Plan designated Longfield Estates as rural residential, which limits new residential growth and aims to protect and

County Council "took no action to over-ride the conclusion of the Planning Board" that the amended development plan constituted a conflict with the Master Plan. The Board of Appeals noted further that its review was de novo and, "[a]s such, prior actions and determinations alleged to have occurred by operation of law no longer stand." The opinion continued:

> Nevertheless, having received the matter *de novo,* our referral for the Planning Board determination as to Master Plan conflict was essential to a final decision. The resultant finding of the actual existence of such a conflict can not, under the CRG Rules, be ignored. Therefore, once the Planning Board has now determined that such a conflict with the 2010 Master Plan does in fact exist, and no action having been taken to the contrary by the County Council, it is clear that the requested amendment to the original CRG Plan in this matter can not be allowed.

On 30 July 2009, HNS filed timely a petition for judicial review. A hearing was held on 13 April 2010 in the Circuit Court for Baltimore County. The Circuit Court issued its opinion shortly thereafter affirming the Board of Appeals's decision. On 28 May 2010, HNS appealed timely to the Court of Special Appeals.

The Court of Special Appeals, in *HNS Development, LLC v. People's Counsel for Baltimore County,* 200 Md.App. 1, 24

---

maintain the character of such areas. The memorandum cited also the 2010 Master Plan's scenic resources policy, which is to "[p]reserve and enhance the county's scenic resources ... including scenic corridors, scenic views and gateways, as an essential component contributing to the county's quality of life." The memorandum relied also on the Greater Kingsville Community Plan, adopted by the County Council on 1 July 1996, which states that scenic views of historic places, including the Langenfelder Mansion, a designated historic property, be "enhanced and protected." The Community Plan requested, in the context of residential development, that "development of significant scope have an area set aside either on individual lots or in single ownership where additional non-agricultural construction is not permitted. The location of open space would depend on environmental sensitivity, protection of neighboring agriculture, visual impact, and compatibility with the proposed development with neighboring properties."

A.3d 167 (2011), affirmed the judgment of the Circuit Court. The intermediate appellate court concluded that, although the CRG failed to act timely, the "deemed approved" provision of B.C.C. § 22–47 did not immunize the amended plan in this case from further governmental review because: 1) HNS waived this argument by failing to raise it before the Board of Appeals, 2) B.C.C. § 22–47 did not contain any language purporting to immunize "deemed approved" plans at the CRG stage from review on appeal to the Board of Appeals, and 3) the legislative history of B.C.C. § 22–47 did not suggest that "a matter deemed approved is foreclosed" from further review. *HNS*, 200 Md.App. at 17, 24 A.3d at 177.

The Court of Special Appeals concluded also that the Baltimore County Master Plan "is binding as to development and subdivision plans in Baltimore County" because provisions of the Baltimore County Code direct that "development of land must conform to the master plan." *HNS*, 200 Md.App. at 35, 24 A.3d at 188. Considering the gauntlet that a proposed development plan must run, as set out in B.C.C. §§ 22–54 (pre-development conference), 22–56 (DPW review of plan), 22–57 and 22–58 (allowing the CRG to determine if a Master Plan conflict existed), 22–59 (allowing the CRG to refer the question of a possible conflict with the Master Plan to the Planning Board), 22–60 (requiring the Planning Board to make a determination of Master Plan compliance and forward its decision to the County Council for review), 22–61 (making the Planning Board's determination final if the County Council fails to overrule the Planning Board's recommendation), and 22–61 (providing for an appeal to the Board of Appeals), the intermediate appellate court rejected HNS's argument that B.C.C. §§ 22–37 and 22–38, when read together, create "deemed compliance" with the Master Plan when the other development regulations in the County Code are met. *HNS*, 200 Md.App. at 38, 24 A.3d at 190.

As to whether HNS's argument that the County Council's failure to place in reservation or acquire the subject property after the Planning Board notified it of the Master Plan conflict constituted a taking (without just compensation) of Parcel A

and Lot 42, the intermediate appellate court concluded that HNS failed to preserve the issue for appeal because it was not "raised previously in the CRG process, before the Board on appeal in 2005, through 2006, or before the Planning Board on remand and, as such, was not a part of [the] Planning Board's April 17, 2008 Report to the Board." *HNS,* 200 Md.App. at 42–43, 24 A.3d at 192. Even if the issue was not waived, the appellate court concluded that the County's process for the reservation and public acquisition of land to preclude development did not apply to amendments to previously approved development plans. *HNS,* 200 Md.App. at 42, 24 A.3d at 192–93.

HNS filed timely a petition for a writ of certiorari, which we granted, *HNS Development, LLC v. People's Counsel for Baltimore County,* 423 Md. 450, 31 A.3d 919 (2011), to consider the following questions:

1) Did the county board of appeals impermissibly create a new requirement of Master Plan compliance in addition to that contained in the stated development regulations?

2) Did the county board of appeals impermissibly create upon a finding of Master Plan conflict a means of taking without just compensation?

3) Is the statement on a development plan that a county agency would oppose further development of a parcel and lot the same as an exaction or condition of development as discussed in *City of Annapolis v. Waterman,* 357 Md. 484, 745 A.2d 1000 (2000)?

We hold that, according to the Baltimore County Code, the Master Plan is an inextricable part of the development regulations and, as such, compliance with its recommendations is a binding regulatory requirement of the subdivision and development plan review process in the County. Thus, nonconformity with the Master Plan can provide a valid and an independent basis for denying approval of a proposed amended development plan, compliance with the other requirements of the development regulations notwithstanding. Petitioner's takings question is waived due to HNS's failure, under Mary-

land Rule 8–504(a)(5) and (6), to provide in its brief any argument regarding the appropriate standard of review to apply or any authorities in support of its position. We conclude also that, on the record of this case, there is no justiciable controversy whether Note 18 on the 1991 development plan approval was an impermissible exaction. Moreover, this issue is moot, in light of our conclusion that nonconformity with the Master Plan can serve as an independent reason for rejecting an amended development plan. Accordingly, we affirm the judgment of the Court of Special Appeals.

## II. STANDARD OF REVIEW

We review directly the action of local government administrative body, notwithstanding the same review by any intervening courts. *People's Counsel for Balt. Cnty. v. Loyola Coll. in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008). Where findings of fact or discretionary judgments are involved, the scope of our review is narrow—we do not "substitute [our] judgment for the expertise of those persons who constitute the administrative agency." *Loyola Coll.*, 406 Md. at 66–67, 956 A.2d at 173 (quoting *United Parcel Serv., Inc. v. People's Counsel for Balt. Cnty.*, 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994)). We will uphold such decisions of the administrative agency so long as they are supported reasonably by "substantial evidence." *People's Counsel for Balt. Cnty. v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007) (quoting, among others, *Mayor & Aldermen of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979)).

When an agency resolves a question of law, however, our review is less deferential. We will not uphold an "administrative decision which is premised solely upon an erroneous conclusion of law." *People's Counsel for Balt. Cnty. v. Md. Marine Mfg. Co.*, 316 Md. 491, 497, 560 A.2d 32, 34–35 (1989). A "degree of deference should often be accorded the position of the administrative agency" charged with interpreting and enforcing a particular set of statutes or regulations. *Surina*, 400 Md. at 682, 929 A.2d at 911 (quoting *Marzullo v. Kahl*, 366

Md. 158, 172, 783 A.2d 169, 177 (2001)). Our task is to "ascertain and effectuate" the intent of the legislative body and to avoid "construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense." *Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 550, 814 A.2d 469, 490 (2002). To accomplish this task, "we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry." *Id.* We keep in mind that particular provisions of a statute are interpreted in the context of the entire statutory scheme, and "read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory." *Id.* (citing *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302–03, 783 A.2d 667, 671 (2001)).

## III.  DISCUSSION

### A.  The Master Plan Conflict

■ HNS maintains that the Board of Appeals erred in denying the proposed amended development plan on the basis of the Planning Board's finding that approval of the plan would conflict with the Master Plan. B.C.C. § 22–38 states that "[c]ompliance with the development regulations hereinafter set forth shall be deemed the fulfillment of the development policies set forth in section 22–37 and purposes set forth in section 22–38." Therefore, HNS reasons that because the amended development plan met the physical, special, and other development regulations, this achievement alone equated to conformance with all of the development regulations, including the Master Plan. HNS reasons further that the CRG approval process does not require proof of discrete conformance with the Master Plan and that decades of CRG practice demonstrates that compliance with the development regulations alone has "been deemed" sufficient to merit approval. On the other hand, Respondents maintain that Master Plan

compliance is a discrete requirement of development plan review. Although the Master Plan textual recommendations are framed as advisory, rather than mandatory, non-conformance with those recommendations remains a proper basis for denying HNS's amended development plan.

We begin our analysis with a brief overview of the role of the Master Plan in Baltimore County. The Baltimore County Master Plan sets forth "comprehensive objectives, policies, and standards to serve as a guide for the development of the county." Baltimore County Charter, § 523. The Office of Planning prepares a proposed Master Plan (and amendments), which the County Council must accept or modify, and then adopts it by resolution. *Id.* The Master Plan objectives and policies are incorporated into the development purposes and policies set forth in B.C.C. §§ 22–37 (Development Policies) and 22–38 (Development Purposes). B.C.C. § 22–37 states that "[a]ll development of land must conform to the master plan and these regulations." A stated purpose of the development regulations is "[t]o implement the future growth and development of Baltimore County in accordance with the master plan." B.C.C. § 22–38(b). As noted by HNS, B.C.C. § 22–38 provides that "[c]ompliance with the development regulations hereinafter set forth shall be deemed the fulfillment of the development policies set forth in section 22–37 and the purposes set forth in section 22–38." The "development regulations" are set forth in B.C.C. § 22–37 through § 22–119. B.C.C. § 22–40(b). Compliance with the Master Plan is considered a part of the development plan review and approval process. B.C.C. § 22–54(b).

At the time of the review and approval of Phase II of the Longfield Estates subdivision in 1991, development plan review was conducted under a prior iteration of the CRG process, which is no longer in existence.[12] In 2005, when HNS filed its amended development plan, the County Code provided

_____

12.  "The CRG consists of the directors of the department of public works and office of planning and zoning or their designated representatives." B.C.C. § 22–57(a).

that proposed amendments to approved development plans be reviewed in the same manner as the original plan.[13] Prior to a development plan being filed, the Office of Planning and the DPW hold a pre-development conference to provide the applicant with information about policies, standards, or legislation that may affect the subject property. B.C.C. § 22–54. After the pre-development conference, which may be waived by the applicant, the proposed development plan is submitted to the DPW. If the proposed plan provides the necessary information described in B.C.C. § 22–55, the DPW forwards the plan to the CRG within 15 days of receipt of the plan. B.C.C. § 22–56(a). The DPW is to schedule a meeting of the CRG no earlier than 15 days, but no later than 30 days, after the plan is accepted for filing. B.C.C. § 22–56(b). If a county agency (including the DPW) fails to act within its statutory time frame, the plan is deemed approved, unless an administrative officer provides an excuse in writing within seven days of the time lapsing. B.C.C. § 22–47.

When the CRG meets, if it appears that the proposal conflicts with the Master Plan, the development plan must be referred to the Planning Board. B.C.C. § 22–59(a)(1). After its review of the potential Master Plan conflict, the Planning Board files concurrently a written decision with the CRG and the Baltimore County Council. B.C.C. § 22–60(b)(1). Unless the County Council overrules the Planning Board's determination regarding the Master Plan conflict, the Planning Board's decision is binding upon the CRG and must be incorporated into the CRG's final action on a proposed plan. B.C.C. § 22–60(c). Any person "aggrieved or feeling aggrieved by final

---

**13.** The Board of Appeals explained in its 6 April 2007 opinion:

The CRG process was adopted in Baltimore County by Council Bill 56, 1982, and codified in the Baltimore County Code, 1978 in Sections 22–37 et seq. The CRG process has been superceded by the development process in use today in B.C.C. Sections 32–4–101, et seq. However, any amendments to plans adopted using the CRG process were to 'be reviewed and approved in the same manner as the original plan.' (Section 32–4–262).

B.C.C. § 32–4–262(2) now provides that amendments to development plans are reviewed under current regulations.

action on a plan" may appeal to the Board of Appeals within 30 days of the date of the final action by the CRG. B.C.C. § 22–61(a). On review by the Board of Appeals, "[t]he final action on a plan shall be presumed correct and the person aggrieved shall have the burden of persuasion to show that such action was arbitrary or capricious, procured by fraud, or otherwise illegal." B.C.C. § 22–61(d).

HNS's view that its amended development plan met the "development regulations" and, therefore, must be deemed in compliance with the ordinance and the Master Plan is an illogical conclusion that imagines a unique conception of "development regulations" not contemplated by the Code. The development regulations are composed of *all* of the policies, definitions, procedures, and rules found in B.C.C. § 22–37 through 22–119. These sections of the code incorporate the Master Plan in multiple locations by stating that: "land must conform to the master plan *and* these regulations" (B.C.C. § 22–37(a) (emphasis added)); growth must be implemented "in accordance with the master plan" (B.C.C. § 22–38(a)); pre-development conferences must address potential Master Plan intent and conflicts; (B.C.C. § 22–54(b)); the CRG must refer Master Plan conflicts to the Planning Board (B.C.C. § 22–59(a)(1)); and the Planning Board must dispose of the Master Plan conflict by a certain procedure (B.C.C. § 22–60(b)(1) & (c)).

HNS's narrow reading of B.C.C. § 22–38 ignores the integrated role of the Master Plan in the overall land development regulatory scheme. We do not see how, once the Planning Board's decision (that the proposal reflected in the amended development plan was in conflict with the Master Plan) became binding on the CRG review and approval process, the development could still be in compliance with the development regulations.

The amended development plan could not be in compliance with the development regulations without conforming to the Master Plan. In our view, the language of B.C.C. § 22–38, which states that "[c]ompliance with the development regula-

tions hereinafter set forth shall be deemed the fulfilment of the development policies in section 22–37 and purposes set forth in section 22–38," is clear and unambiguous. A development plan must adhere to all of the development regulations and procedures, from B.C.C. § 22–37 through B.C.C. 22–119, in order to meet the broad goals set forth in B.C.C. § 22–37, which includes regulations addressing the Master Plan goals. In this statutory context, conformance to the recommendations of the Master Plan rises to the level of a regulatory device, rather than a mere recommendation. A conflict with the Master Plan obliges the CRG to defer to the Planning Board, whose decision must be incorporated in the CRG's final action on the development plan. When the Planning Board concluded there was a conflict with the Master Plan and recommended denial of the amended development plan, there was no possible way for the amended development plan proposal to be "deemed in compliance with the" development regulations, its adherence to other requirements in the regulations notwithstanding.

HNS concedes that the Master Plan and development regulations have a "close nexus" and that the development regulations contain strategies to achieve the goals of the Master Plan. Those strategies for compliance include the Planning Board process for determining potential Master Plan conflicts. As HNS points out, the textual recommendations of the Master Plan and community plans are rarely site-specific in their language, so the seemingly broad resolution provisions for determining conflicts are necessary to allow the technically competent county personnel to interpret the Master Plan on a site-by-site basis as development proposals are tendered. HNS failed to explain a cogent reason for why the Board of Appeals's decision to reject an amended development plan, that conflicted admittedly with the Master Plan, was improper in light of clear statutory language that "development of land must conform to the master plan."

The Baltimore County Code provides a process where the County Council, as part of the development review process, may place in reservation, for up to 18 months, a portion or all

of the land involved in a development submission, thus delaying development while the County determines if it should acquire the property. *Sycamore Realty Co. v. People's Counsel for Balt. Cnty.*, 344 Md. 57, 59, 684 A.2d 1331, 1332 (1996). The County Council may acquire through negotiation or condemnation the reserved property for public interest purposes, including open space, environmental preservation, playgrounds, or parks. *Id.; see also* B.C.C. § 32–2–301(a) (2003). B.C.C. § 22–18, titled "Effects of proposals in master plan on applications for building permits or for approval of preliminary subdivision plans," provides the procedure whereby the Planning Board, or another agency, determines "whether ... it believes that it would be in the public interest to reserve any portion or all of the land." If the Planning Board concludes that the County should reserve all or part of the land, it must send a report and recommendation to the County Council. B.C.C. § 22–18. The County Council has 30 days to "pass a resolution declaring the reservation and describing the land to be reserved." B.C.C. § 22–18. If the County Council does not resolve to reserve all or part of the property, the inquiry ends as to whether a reservation is in the public interest, and the property may not be considered again for reservation by the local government for a period of two years. B.C.C. § 22–18.

HNS reasons that, because there is no provision in B.C.C. § 22–18 for what happens when (as happened here) the Planning Board, in identifying a Master Plan conflict, recommends nonetheless that the County Council *not* reserve or purchase the subject property, the conclusion that a Master Plan conflict exists has no efficacy. This ignores plainly the import in the development regulations of a Master Plan conflict. When the Planning Board concludes that it is not in the public interest to acquire a property, and the County Council does not override this position, the Planning Board's conclusion that the amended development plan is in conflict with the Master Plan remains and is binding on the final action taken by the CRG. Nothing in B.C.C. § 22–18 negates B.C.C. § 22–60(c); it provides a procedure for determining whether the County should attempt to acquire the property.

Here the County Council did not act to overrule the Planning Board's conclusion that the amended development plan conflicted with the 1998–2000 and 2010 Master Plans; therefore, B.C.C. § 22–60(c) mandates that that decision become part of the final CRG action. Regardless of whether the Board of Appeals erred by retaining jurisdiction over the case (as all parties contend), rather than remanding it back to the CRG (instead of the Planning Board), the end game is the same, in our view. The county agency tasked with determining whether a Master Plan conflict existed made its decision. This decision was not arbitrary or capricious, based as it was on analysis of the prevailing Master Plan at the time of the original development approval of Phase II of the Longfield Estates development in 1991, Note 18 appended to that plan, and the Master Plan in effect when the proposed amended development plan for Lot 42 and Parcel A was considered. HNS does not assert here that the Planning Board concluded improperly that there was a Master Plan conflict.

HNS strains to make something of the distinction between Master Plan conflict versus conformance. It states that the conflict provisions in the development regulations are in place only as a trigger to allow the County time to acquire properties, found to be in conflict with the Master Plan and desirable for public acquisition, through eminent domain or negotiation. In our view, whether a property, empressed with a reservation, is acquired by the County is a wholly separate process and purpose of the B.C.C., discussed *supra*. Equally significant, if not of greater importance, the development regulations determine how the County is to be developed over time and place restrictions on developments and subdivisions in order to achieve the long term goals of the Master Plan. Whether conforming development is in the best interest of the County and the public is a separate matter from acquisition of desirable public property. As pointed out by HNS, nine parcels in the original Phase II Longfield Estates development plan were found to be in conflict with the Master Plan initially, but were not acquired by the County, presumably because to do so would not benefit the public. Moreover, the developer modi-

fied its development proposal for these lots so as to ameliorate the conflict and induce the County not to reserve the lots. Acquisition of a property is not the only mechanism for the County to protect its Master Plan goals. Reasonable restrictions on development, including limiting lot sizes, house siting, and numbers of lots, are implemented regularly and are not challenged here by HNS. These restrictions were implemented in the initial Phase II Longfield Estates development plan, approved by the CRG, in order to bring the development into conformance with the Master Plan. The Planning Board is maintaining presently a position it took originally in 1991 with regard to Lot 42 and Parcel A in order to protect the Master Plan-recommended viewshed of a historic property.

We agree with the Court of Special Appeals's reasoning that when the development regulations incorporate Master Plan compliance the Master Plan itself becomes a regulatory device, rather than a mere guide and recommendation. *HNS,* 200 Md.App. at 34, 24 A.3d at 188. In *Rylyns,* we concluded that a municipality's imposition, at the insistence of Montgomery County, of a more restrictive zoning classification on a parcel of newly annexed land than provided by the city's zoning law was impermissible. 372 Md. at 521, 814 A.2d at 479. We explained in *Rylyns* that master plans,

> which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statutes or local ordinances linking planning and zoning. Where the latter exists, however, they serve to elevate the status of comprehensive plans to the level of true regulatory devices.

372 Md. at 530, 814 A.2d at 478. In *Coffey v. Maryland–National Capital Park & Planning Commission,* 293 Md. 24, 25, 441 A.2d 1041, 1041 (1982), the Prince George's County Planning Board rejected a proposed subdivision plan because it did not conform to the Master Plan, and we concluded that "when subdivision regulations require that a proposed subdivision comply with the master plan, an application for approval of a preliminary subdivision plan that fails to so comply must be rejected." In *Maryland–National Capital Park & Plan-*

*ning Commission v. Greater Baden–Aquasco Citizens Association*, 412 Md. 73, 102, 985 A.2d 1160, 1177 (2009), we held that the provisions of a Master Plan were mandatory where Prince George's County subdivision regulations required that subdivision "plat[s] shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate." We find no principled distinction between these cases and the present one.

## B. A Taking Without Just Compensation?

■ HNS argues that, when the Board of Appeals denied the amended development plan solely on the basis of a Master Plan conflict, a taking without just compensation occurred. The Court of Special Appeals concluded that HNS failed to preserve properly this issue for appeal. We disagree with this reasoning because HNS presented, in oral argument to the Board of Appeals at its 17 December 2008 hearing, a vague, but notice-worthy, takings argument.[14] Although we consider the issue preserved (barely), we conclude that this challenge is waived for two reasons. Under Maryland Rule 8–504(a)(5), a brief is to contain "[a] concise statement of the applicable standard of review for each issue, which may appear in the discussion of the issue or under a separate heading placed before the argument." Moreover, Maryland Rule 8–504(a)(6) requires a brief to supply "argument in support of the party's position on each issue." A necessary part of any argument are case, statutory, and/or constitutional authorities to support it. We have said that Maryland Rules "are not guides to the practice of law but precise rubrics 'established to promote the

---

14. The Court of Special Appeals concluded, alternatively, that there was no taking because B.C.C. § 22–18 applies only to initial subdivision plans and not the amended development plan at issue here. *HNS Dev., LLC v. People's Counsel for Balt. Cnty.*, 200 Md.App. 1, 43, 24 A.3d 167, 193 (2011). The intermediate appellate court concluded further that HNS was not denied all reasonable or beneficial use of the property because it purchased the 13–acres of Lot 42 and Parcel A in 2004 for $800,000 and later sold Lot 42 alone for $1,350,000.00. *HNS*, 200 Md.App. at 44, 24 A.3d at 193.

orderly and efficient administration of justice and [that they] are to be read and followed.'" *Isen v. Phoenix Assurance Co.,* 259 Md. 564, 570, 270 A.2d 476, 479 (1970) (quoting *Brown v. Fraley,* 222 Md. 480, 483, 161 A.2d 128, 130 (1960)). Maryland Rule 8–504(c) allows this Court to "dismiss the appeal or make any other appropriate order with respect to the case," in the event of noncompliance with Md. Rule 8–504(a)(5).

The Court of Special Appeals refused repeatedly (based on Md. Rule 8–504(a)(5)) to address issues not briefed properly by a party. *See, e.g., Rollins v. Capital Plaza Assocs.,* 181 Md.App. 188, 202, 955 A.2d 869, 877 (2008) (stating that where a party cited no controlling law to support her position, the court refused to seek out law to sustain her position); *Kramer v. Mayor & City Council of Balt.,* 124 Md.App. 616, 634, 723 A.2d 529, 538 (1999) (refusing to address an issue not supported in the brief by argument or authority); *Konover Prop. Trust, Inc. v. WHE Assocs.,* 142 Md.App. 476, 494, 790 A.2d 720, 730 (2002) (stating that where a party failed to cite any relevant law on an issue in its brief, the court refused to "rummage in a dark cellar for coal that isn't there," or to "fashion coherent legal theories to support appellant's sweeping claims" (citing *Elecs. Store, Inc. v. Cellco P'ship,* 127 Md.App. 385, 405, 732 A.2d 980, 990 (1999))). HNS's brief addressing the question of whether a taking occurred does not cite any constitutional or common law authority for its position.[15] The brief provides only sweeping accusations and conclusory statements. After reviewing HNS's brief, we are disinclined to search for and supply HNS with authority to support its bald and undeveloped allegation that the Board of Appeals's action constituted a taking, no matter how alluring such a sweeping claim may be.[16] Considering the well-devel-

---

15. HNS's sole citation of any "authority" in the relevant argument section of its brief is to *City of Annapolis v. Waterman,* 357 Md. 484, 745 A.2d 1000 (2000), for the proposition that "[c]ertainly a subdivision may include conditions and prescription against developing certain areas as a part of the overall scheme of development." *City of Annapolis* provides no authority for HNS's claim of a regulatory taking.

16. HNS's reply brief was devoid similarly of argument and authority.

oped body of law addressing Fifth Amendment takings, including those applied specifically to regulatory takings, this omission is unacceptable and so we deem this argument waived for present purposes.

## C. Is Note 18 an Exaction?

HNS argues that Note 18 on the 1991 Longfield Estates, Phase II, final development plan does not rise to the level of an exaction as discussed in *City of Annapolis v. Waterman,* 357 Md. 484, 745 A.2d 1000 (2000), and, therefore, the Board of Appeals could not rely on the Note as a basis for denying the amended development plan. To the contrary, HNS argues that Note 18, by encouraging the owner in 1991 to place conservation easements on the parcels, indicated that there were valuable development rights remaining in Parcel A and Lot 42, and that HNS was entitled to execute those rights now. HNS argues also that Note 18, although not a regulatory taking in and of itself, "contains the threat that there may ultimately be a county taking under the master plan conflict provisions in the event of a subdivision." Respondents agree that Note 18 was not an exaction.

There is no dispute between the parties that Note 18 is not an exaction and, therefore, we decline to offer an advisory opinion, a practice long forbidden by this Court. *Md.-Nat'l Capital Park & Planning Comm'n v. Randall,* 209 Md. 18, 27, 120 A.2d 195, 199 (1956) ("[C]ourts will not, in the absence of constitutional mandate, render advisory opinions." (citing *Hammond v. Lancaster,* 194 Md. 462, 71 A.2d 474 (1950))); ("[n]or will the courts render advisory opinions unless there is an actual justiciable controversy between the parties" (citing *Tanner v. McKeldin,* 202 Md. 569, 97 A.2d 449 (1953))). We conclude also that this question is moot in light of our conclusion that nonconformity with the Master Plan provides a valid and independent basis for rejecting the amended development plan.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**