**Raymond PROFFITT, Appellant,**

v.

**ROHM & HAAS.**

**No. 87–1563.**

United States Court of Appeals, Third Circuit.

Argued Feb. 2, 1988.

Decided June 29, 1988.

Rehearing Denied July 26, 1988.

Randall J. Brubaker (argued), Beth Oswald, Philadelphia, Pa., for appellant.

Hershel J. Richman (argued), Thomas J. Stukane, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellee.

Before SLOVITER, STAPLETON and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### Introduction

Appellant Raymond Proffitt brought this citizen suit against Rohm & Haas for violations of the federal Clean Water Act, 33 U.S.C.A. §§ 1251–1376 (West 1986 & Supp. 1988), and for violation of Pennsylvania's Clean Streams Law, 35 Pa.Stat.Ann. §§ 691.1–.1001 (Purdon 1977 and Supp. 1988). Proffitt alleged that Rohm & Haas' discharges between 1980 and 1985 from "Outfall 009" at its Bristol, Pennsylvania plant exceeded the limits imposed by the National Pollutant Discharge Elimination System (NPDES) permit issued to it by the Environmental Protection Agency (EPA) for Total Suspended Solids (TSS) (the amount of solid matter suspended in the water) and also fell outside the required range set for the pH of the discharge (its acidity or alkalinity) and that they were also in excess of state law limits. Rohm & Haas responded through a motion for summary judgment that it was not in violation of its NPDES permit as to TSS or pH because these limitations had been stayed by the EPA pursuant to a 1976 stipulation which had been incorporated into an amended NPDES permit issued to Rohm & Haas at that time. The district court granted Rohm & Haas' motion for summary judgment on that ground. 668 F.Supp. 436.

Proffitt appeals, arguing alternatively that EPA's stay of enforcement was not valid, or, if valid, was not effective to bar a citizen suit under the Clean Water Act. Proffitt also appeals from the district court's adverse judgment on his pendent state law claims.

I.

*Facts*

Under the Federal Water Pollution Control Act Amendments of 1972, generally referred to as the Clean Water Act, 33 U.S.C.A. §§ 1251–1376, it is illegal to discharge pollutants into the navigable waters of the United States without a permit issued under the National Pollutant Discharge Elimination System (NPDES) unless one of the other statutory exceptions applies, 33 U.S.C.A. § 1311(a). As a condition to the NPDES permit, the statute requires "certification" by the state where the discharge originated that the discharge complies with applicable state and federal effluent limitations and water quality standards, 33 U.S.C.A. § 1341. The state may set additional limitations which are then included in the NPDES permit. 33 U.S.C.A. § 1341(d). Because the resolution of this case depends on the existence and effect of any limitations imposed by the NPDES permits issued to Rohm & Haas, a rather extended examination of the permits issued to it is required.

On September 30, 1974, Rohm & Haas was issued an NPDES permit by the EPA, effective October 30, 1974 (referred to hereafter as the 1974 permit). That 1974 permit set effluent limitations based on four general, commonly-used indicia of water quality, *i.e.,* TSS, pH, chemical oxygen demand (COD), and biochemical oxygen demand (BOD).[1]

The Pennsylvania Department of Environmental Regulation (PaDER) set additional effluent limitations in its certification for Rohm & Haas' permit which included, *inter alia,* limitations on TSS and pH.[2] That certification was later amended by the state on August 22, 1975 to impose more stringent limitations on Rohm & Haas.[3]

Rohm & Haas then appealed both the EPA limits in the NPDES permit and the PaDER limits set out in the certification; the appeal on the EPA limits was made in the form of a request for an adjudicatory hearing to that agency. *See* 40 C.F.R. § 125.36 (1975). The appeal of the state certification was taken to the Pennsylvania Environmental Hearing Board (EHB), because only the state may review the limits which it sets through the certification process. *See Lake Erie Alliance for the Protection of the Coastal Corridor v. U.S. Army Corps of Engineers,* 526 F.Supp. 1063, 1074 (W.D.Pa.1981), *aff'd mem.,* 707 F.2d 1392 (3d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); *Roosevelt Campobello Int'l Park Comm'n v. United States E.P.A.,* 684 F.2d 1041, 1056 (1st Cir.1982).

The EPA adjudicatory hearing to contest the limits in the 1974 NPDES permit which was requested by Rohm & Haas was never held.[4] Instead, in 1976 the EPA, the PaDER, and Rohm & Haas stipulated to an agreement, certified by an administrative law judge, under which Rohm & Haas withdrew its request for such a hearing. Under the terms of this stipulation, the 1974 NPDES limitations on discharge of TSS at Outfall 009, expressed in terms of kilograms per day, were to be modified to incorporate those imposed in 1975 by the PaDER, that is, 20 mg per liter average per day not to exceed a 100 mg per liter daily maximum. The pH limitations of from 6.0 to 9.0 were to remain the same under the new permit. Under the stipulation, the limitations in the 1976 permit for

---

1. The discharge of TSS was limited by the 1974 permit to 115 kilograms per day as an average, not to exceed a maximum for any one day of 186 kilograms of TSS. The pH requirement was set between 6.0 and 9.0. App. at 35. One substance-specific effluent limitation was also established, a limitation on the discharge of cadmium. App. at 42.

2. The pH requirement was the same as that set by the EPA (6.0–9.0), and the TSS limit was set originally at 90% removal of those suspended solids with a maximum of 100 milligrams per

liter of discharge, whichever was more stringent. App. at 101.

3. The amendment required that the daily average of TSS not exceed 20 milligrams per liter with an absolute maximum of 100 milligrams per liter on any particular day.

4. Nor was any hearing held before the Pennsylvania Environmental Hearing Board on Rohm & Haas' objections to the state's certification included in the 1974 permit.

both TSS and pH would be asterisked and made subject to a stay of the enforcement if certain conditions occurred:

(a) Upon the EPA's receipt of documentation from the permittee that the permittee has commenced action in an appropriate state forum to obtain relief from the effluent limitations and conditions asterisked, the EPA shall stay enforcement of said limitations and conditions.

(b) After a final administrative determination and/or judicial determination, by the State of Pennsylvania with respect to the effluent limitations and conditions set forth in paragraph (2) above [the limitations on TSS and pH], said effluent limitations and conditions shall be modified by the EPA in accordance with such final determination.

App. at 44. These conditions also provided that if Rohm & Haas was still dissatisfied with the modified limitations set under this procedure, it could request an adjudicatory hearing before the EPA.

That 1976 stipulation also made other substantive changes in the terms of the 1974 permit, including the deletion of some of the requirements that had been imposed by the 1974 permit.[5] All of these stipulated provisions were then incorporated into an amendment to the original NPDES permit issued in 1974. This amended permit (referred to hereafter as the 1976 permit) was issued by the EPA in July 1976 and sent to Rohm & Haas with the provision that the amendment would become effective upon receipt.

The sequence of events contemplated in the asterisked provisions of the 1976 permit that provided for a stay of the TSS and pH limits pending redetermination of these limits by the state did not occur. Rohm & Haas did appeal these limitations to the state board and notified the EPA of the same. According to the terms of the 1976 permit, an appeal would stay EPA enforcement of the appealed terms; however, the appeal to the EHB was withdrawn after the PaDER and Rohm & Haas reached an agreement by which the state withdrew the certifications that it issued in 1974 and 1975 and waived any right to issue a certification in connection with the permit, thereby removing itself from the dispute and allowing the EPA to "determine on its own the numbers to be put in the permit." App. at 112. Because the PaDER had "dropped out of the picture" without setting any final limits on TSS or pH, there was no "final administrative ... or judicial determination" as referred to in the 1976 permit which the EPA could adopt as the state's "final determination" and include in the NPDES permit.

With the PaDER no longer involved, any modification in the 1976 permit could come only from the EPA. On December 22, 1977, one month before the PaDER's withdrawal of its certification and in anticipation of that withdrawal, Rohm & Haas wrote to the EPA proposing new limits on both pH and TSS.[6] The EPA did issue a new draft permit incorporating Rohm & Haas' suggestions on April 26, 1978, but this permit never became effective.

Nothing further happened until 1985 when Proffitt filed this citizen suit against Rohm & Haas under section 505 of the Clean Water Act, 33 U.S.C.A. § 1365, after sending the statutorily required 60–day notice to Rohm & Haas, the EPA and the state of his intention to sue. Proffitt listed numerous violations of the specific TSS and pH limits that had been established by the 1976 permit. These violations are alleged to be ongoing. Proffitt sought a declaratory judgment that Rohm & Haas had violated the provisions of the federal Clean Water Act, an injunction against the defendant from continued violations of that Act, civil

---

5. For example, the limitation on cadmium discharge at Outfall 009 was eliminated.

6. Rohm & Haas proposed that allowable pH limits be in a range of 6.0 to 10.0, and that TSS limits be set at a daily average of 100 milligrams per liter with a daily maximum of 200 milligrams per liter. In its letter, Rohm & Haas also maintained that it was the presence of algae in the discharge lagoons that was the source of its pH and TSS violations, not pollution by Rohm & Haas, and its letter proposed a way of screening out that portion of any excesses over the permit limits caused by algae.

penalties against Rohm & Haas for those violations, and attorney's fees and costs.

The district court, granting Rohm & Haas' motion for summary judgment, held that Rohm & Haas was not in violation of the 1976 permit because in that permit the EPA had stayed its enforcement of the limitations which Rohm & Haas is alleged to have violated. The court concluded therefore that neither the EPA nor a citizen could bring suit to redress any violations. *Proffitt v. Rohm & Haas*, 668 F.Supp. 436, 440–41 (E.D.Pa.1987).

The district court also dismissed Proffitt's pendent state law claims under the Pennsylvania Clean Streams Law on the ground that once the PaDER had revoked its prior certifications and waived its right to issue a certification in regard to the NPDES permit, it was not possible for Rohm & Haas to be in violation of Pennsylvania's Clean Streams Law. *Id.* Proffitt appeals. Our standard of review over a grant of a summary judgment motion is plenary.

## II.

### *Discussion*

#### A.

Proffitt challenges the analysis that underlay the district court's order dismissing this action on several grounds. He argues that the 1976 permit is not valid, that it forecloses only the EPA and not a citizen from enforcing the limitations and conditions set forth therein, and that even if the language of the stay is construed as applicable to a citizen's suit, the EPA could not legally preclude citizen enforcement of permit limitations. Finally, he argues that the stay could not, in any event, continue without time limitations, particularly when the statute itself provides a five-year limit for permits. To understand Proffitt's arguments, we must review the role of a citizen's suit in enforcement of the Clean Water Act.

As part of the statutory encouragement of "[p]ublic participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan or program established by the Administrator [of the EPA] or any State," 33 U.S.C.A. § 1251(e), section 505(a) of the Act, 33 U.S.C.A. § 1365(a), gives a citizen the right to initiate a civil suit against a polluter. There are only two limitations on the right of the citizen to bring suit. First, the citizen must give sixty days' notice to the Administrator, the State and the alleged polluter to allow the alleged violator the opportunity to cure his violation or to allow the EPA or the state to commence its own enforcement action. 33 U.S.C.A. § 1365(b)(1)(A); *see Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.,* —— U.S. ——, 108 S.Ct. 376, 382–83, 98 L.Ed.2d 306 (1987). Second, a citizen may not bring his or her own action if the "Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State" against the alleged polluter. 33 U.S.C.A. § 1365(b)(1)(B). In that event, however, the citizen may intervene in the agency's suit. *Id.* Proffitt's action satisfies the two statutory prerequisites because he sent the requisite sixty-day notice and neither the EPA nor Pennsylvania are now "diligently prosecuting" an action in court against Rohm & Haas or ever did.[7]

Citizen suits, which first appeared in the Clean Air Act on which the Clean Water Act was modeled, were intended by Congress "to both goad the responsible agencies to more vigorous enforcement of the anti-pollution standards and, if the agencies remained inert, to provide an alternative enforcement mechanism." *Baughman v. Bradford Coal Co.*, 592 F.2d 215, 218 (3d Cir.) (citing S.Rep. No. 1196, 91st Cong. 2d Sess. 2, 35–36 (1970)), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *see also Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir.1976) ("citizen suits provision reflected a deliberate choice by Congress to widen citizen access

---

7. Rohm and Haas does not suggest that the EPA's service of "Notice of Violation" to Rohm & Haas in 1984 for its discharge of pollutants in excess of the TSS and pH limits set in the 1976 permit can be regarded as "diligent prosecution" in court.

to the courts, as a supplemental and effective assurance that the Act would be implemented and enforced" (citation omitted)).

The district court concluded that notwithstanding the absence of any statutory bar to Proffitt's suit, the "stay of enforcement" that was incorporated into the 1976 NPDES permit "preclude[s EPA's] own enforcement of the limitations except in accordance with the provisions of the stipulation," *Proffitt*, 668 F.Supp. at 440, and "[a] private citizen has no greater right to enforce the standard and limitation" than the EPA has, *id.* at 441.

It is questionable whether the EPA can bar a citizen's suit by any means other than its own diligent prosecution. As we stated in *Bethlehem Steel Corp. v. Train*, "[w]hile a citizen must give the EPA advance notice of his intention to sue, there is no authorization to block a citizen's suit under section 505 even though the agency believes that the suit should not go forward." 544 F.2d 657, 660 (3d Cir.1976) (footnote omitted), *cert. denied*, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977); *see also Student Public Interest Research Group v. Fritzsche, Dodge & Olcott, Inc.*, 759 F.2d 1131 (3d Cir.1985) (EPA enforcement action if not an action in court or an equivalent thereto does not bar citizen suit under Clean Water Act to enforce NPDES permit limitations); *Student Public Interest Research Group v. Monsanto*, 600 F.Supp. 1479, 1482 (D.N.J.1985) (same); *Baughman*, 592 F.2d at 218–19 (action by state against polluter does not bar citizen suit); *Friends of the Earth*, 535 F.2d at 178–79 (negotiations between the EPA and the polluter designed to reach a consent decree are "no substitute for enforcement" and "cannot be used to nullify the citizen's statutorily-guaranteed right of enforcement"); *Kitlutsisti v. Arco Alaska, Inc.*, 592 F.Supp. 832, 839 (D.Alaska 1984) ("EPA's promise not to prosecute ... does not insulate [alleged polluter] from citizen suits"), *appeal dismissed and vacated as moot*, 782 F.2d 800 (9th Cir.1986).

We need not decide that issue here. Nor do we decide whether, under the Act, the EPA's agreement to a limited stay of permit limitations during the period that the polluter was pursuing state agency appeals could temporarily bar citizen enforcement.[8] Instead, we limit ourselves to the question whether the stay, under the circumstances presented here, could indefinitely bar Proffitt's citizen suit, which was the effect of the district court's decision.

Rohm & Haas' argument in effect is that it was subject to no effluent discharge limitations on TSS and pH because the 1974 permit was superseded by the amendments incorporated in the 1976 permit which stayed the limitations contained therein. As a preliminary matter, there is considerable doubt about the effectiveness of the 1976 permit. Although we have referred to that permit as the "1976 permit" for convenience, it was, in actuality, Amendment No. 1 to the 1974 permit. The amendment was issued without any public notice or public hearings. Rohm & Haas argues that public notice of the amendment was not required because the public was put on notice that the EPA administrator has the authority to amend a permit after the hearing by the notice of a forthcoming adjudicatory hearing (which was presumably given in this case). 40 C.F.R. § 125.32(e)(8)(v) (1975).

There are at least two flaws to this argument. First, in this case there was no adjudicatory hearing, public or otherwise, and therefore no opportunity for public participation, which is the reason for giving notice. Second, we do not read the regulations to permit dispensing with public notice when an amendment effects a substantial change in the terms of a permit. Here, for example, the amendment did more than "merely limit[ ] the enforcement of standards and limitations pending further administrative proceedings," as the district court stated. 668 F.Supp. at 440. In fact

---

**8.** We note that during the pendency of an adjudicatory hearing before the EPA, "the effect of the contested provision(s) of the proposed permit ... shall be stayed and shall not be considered the final action of the Administrator ... pending final agency action." 40 C.F.R. § 125.36(d)(2) (1975).

that amendment, *i.e.*, the 1976 permit, also deleted certain substantive requirements that had been imposed by the 1974 permit and relaxed other requirements.[9] We see no reason why these substantial changes are not encompassed within the regulation that required "[p]ublic notice of the proposed issuance, denial or modification of every permit ... in a manner designed to inform interested and potentially interested persons of the discharge and of the proposed determination to issue, deny, or modify a permit for the discharge." 40 C.F.R. § 125.32(a) (1975).

In any event, even if the 1976 permit were valid, the sequence of events upon which the stay was expressly predicated never materialized. By its own terms, the stay was dependent upon the "commence[ment of] action in an appropriate state forum to obtain relief from the effluent limitations and conditions asterisked." App. at 59. It would be unreasonable to construe the reference in the stay provision to "commencement" of an action to apply even after Rohm & Haas withdrew that action. Obviously, the stay contemplated a pending state process for determination of Rohm & Haas' challenge to the pH and TSS limitations. When Rohm & Haas expressly withdrew its appeal to the EHB, the predicate for the stay disappeared.[10]

That this is the only reasonable construction of the stay provision is abundantly clear from examination of its language. Paragraph "a." of the asterisked conditions attached to the limitations on pH and TSS provided that the EPA would stay enforcement of those limitations if the EPA received notice of "an action in an appropriate state forum *to obtain relief* from the effluent limitations and conditions asterisked." App. at 59 (emphasis added). This contemplates that the limitations would be in effect if any such action was not commenced or until any such action was commenced. Because the express purpose of the stay was to permit Rohm & Haas to obtain relief in a state forum, once it discontinued such an action the reason for the stay evaporated.

This construction is reinforced by reference to paragraph "b." of the asterisked conditions. It provides that the EPA shall modify its NPDES limitations on TSS and pH to conform with the final "administrative ... and/or judicial determination" made by the state of the proper limitations of TSS and pH. *Id.* The state's withdrawal in January 1978 of the certifications which it had issued in connection with the EPA's issuance of the NPDES permit and Rohm & Haas' withdrawal of its appeal to the Pennsylvania Environmental Hearing Board cannot be deemed a final "administrative or judicial determination of the appropriate limitations" on TSS and pH. If the state proceeding had been aborted, it could obviously yield no final determination.

Rohm & Haas' assertion that as a result of these events, no limitations on TSS and pH were in effect would vitiate Congress' carefully drawn scheme for regulation and elimination of pollution of our navigable waters. Only if a polluter holds an NPDES permit or falls within some other statutory exemption is the pollution authorized. *See* 33 U.S.C.A. § 1311(a). The fact that the EPA has not acted on the 1978 draft permit does not give Rohm & Haas a license to pollute indefinitely. It was precisely the possibility that the EPA might fail to meet its responsibility for enforcement that led Congress to include a citizen suit provision. In such a case, the citizen suit is "interstitial" rather than "intrusive". *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 108 S.Ct. at 383.

9. The permit deleted the limitations on cadmium and COD and relaxed the requirements for BOD, in addition to changing the formula for the limitation on TSS from kilograms per day to milligrams per liter. App. at 45–46.

10. This would be the effect whether Rohm & Haas relies on the stay in the permit or the regulations governing appeals contesting the terms of NPDES limitations which provide that those limitations are automatically stayed pending resolution of the appeal through an adjudicatory hearing. *See* 42 C.F.R. § 125.35(d)(2) (1975). The limitations are stayed only during the period of the pending adjudicatory hearing, and in this case no hearing is pending.

Rohm & Haas suggested at oral argument that the EPA was not concerned about the TSS or the pH limitations because those limitations originated with the state. Transcript of Oral Argument at 32. However, the EPA imposed TSS and pH limits in its 1974 permit and has demonstrated its continuing concern by sending Rohm & Haas notice of violations in 1984.

It follows that even if the 1976 permit containing the stay were valid despite the failure to give public notice of the amendment, the necessary condition to the stay that there be an ongoing state appeal was removed by Rohm & Haas' withdrawal of its appeal to the EHB in 1978, and the stay then expired by its own terms. *See National Audubon Society, Inc. v. Watt*, 678 F.2d 299, 301 (D.C.Cir.1982) (even if stipulation between parties was originally valid, obligations of the parties were discharged by the non-occurrence of the implied conditions of the stipulation). Rohm & Haas' efforts to negotiate further amendments in the permit with the EPA, *see* letter of December 22, 1977 from Rohm & Haas to EPA Region III Director, Enforcement Division, App. at 108–09, could not stay the effectiveness of existing permit limitations. *See Monsanto*, 600 F.Supp. at 1483 ("pend-

ency of a modification proceeding does not excuse violations of a permit prior to actual modification"); *Student Public Interest Research Group v. Fritzsche, Dodge & Olcott, Inc.*, 579 F.Supp. 1528, 1537 (1984) (filing of renewal application does not oust district court of jurisdiction over citizen's section 505 suit), *aff'd*, 759 F.2d 1131 (3d Cir.1985).

It is therefore not material for purposes of this appeal whether the stay ever was effective. It expired no later than 1980. Proffitt's suit charges violation of the NPDES permit between 1980 and 1985.[11] Since he also contends, and Rohm & Haas does not dispute, that the Discharge Monitoring Reports (DMR's) filed by Rohm & Haas disclose its discharge of TSS and pH in excess of the limits permitted under both the 1974 and the 1976 permits, we need not decide the nice question of which permit, if any, is applicable. Moreover, Proffitt has satisfied the requirement that a citizen suit must allege a continuing violation. *Gwaltney*, 108 S.Ct. at 384–86.

It follows that the district court erred in dismissing this suit and it must be remanded to that court.[12]

---

**11.** Because both parties apparently took the view before the district court that "citizen enforcement suits pursuant to section 505, 33 U.S.C.A. § 1365, were intended to involve only a determination of whether EPA permit limitations were violated," 668 F.Supp. at 437, we do not decide whether the scope of citizen suits under the Clean Water Act is so limited. The language of section 505 allows a citizen to bring suit against "any person ... in violation of ... an effluent standard or limitation." 33 U.S.C.A. § 1365(a)(1). That statute defines "effluent standard or limitation" broadly with a violation of an NPDES permit being only one of seven types of violations within the scope of that term. 33 U.S.C.A. § 1365(f). According to 2 W. Rodgers, *Environmental Law: Air and Water* § 4.5 at 70 (1986), effluent limitations enforceable by citizen suits "not only includes permit restrictions laid down pursuant to NPDES proceedings but any other restrictions on effluent output imposed by federal, state, local, and interstate authorities through legislative, administrative, or judicial means. The test would be simply a prior official determination of obligation translatable into source discharge burdens."

Other courts have allowed citizen suits to proceed even when they have not alleged a violation of an NPDES permit limitation. *See, e.g.*,

*Menzel v. County Utilities Corp.*, 712 F.2d 91 (4th Cir.1983) (plaintiff's citizen's suit alleging discharge without a permit survives summary judgment); *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642, 646, 654–55 (E.D.Pa.1981) (citizen suit successful against landfill discharging without a permit). We note, however, Congressional concern "that [s]ection 505 ... not substitute a 'common law' or court-developed definition of water quality ... [that would] require reanalysis of technological [or] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore, an objective evidentiary standard will have to be met by any citizen who brings an action under this section." Senate Committee on Public Works, Federal Water Pollution Control Act Amendments of 1971, S.Rep. No. 414, 92nd Cong., 1st Sess. 79 (1971), *reprinted in 2 Legislative History of the Water Pollution Control Act Amendments of 1972* 1415, 1497 (1973).

**12.** At oral argument, counsel for Rohm & Haas raised for the first time the existence of a new NPDES permit issued by the State of Pennsylvania to Rohm & Haas. Any effect of this permit, if indeed one has been issued and is final, is not

### B.

■ The district court also dismissed Proffitt's pendent state law claims alleging violation of Pennsylvania's Clean Streams Law, 35 Pa.Stat.Ann. §§ 691.1–.1001 (Purdon 1977 and Supp.1988). The court based its dismissal on the ground that the PaDER had in a 1978 letter agreed to waive the certification it had issued in conjunction with the issuance of the original NPDES permit in 1974. *See* App. at 106. However, in that same letter, the PaDER clearly stated:

> By waiving certification we do not imply that the source applying for an NPDES permit is now in compliance with our effluent limitations or permit requirements established pursuant to the Clean Streams Law, Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. 691.1, or that such source is discharging in compliance with the terms or conditions of a state permit. By waiving certification we also do not waive our right to prosecute either civilly or criminally all past, present and future violations of our Clean Streams Law and the Rules and Regulations thereunder. Nor do we waive our right to modify final effluent requirements as is necessary to comply with Pennsylvania Law.

App. at 106. In light of this explicit statement by the PaDER that it had not waived its right to prosecute violations of the Clean Streams Law, the district court's dismissal of the claims based on that law must also be reversed.

### III.

#### *Conclusion*

The district court's order granting summary judgment in favor of appellee Rohm & Haas will be reversed. The case will be remanded to the district court for proceedings consistent with this opinion.

before this court, but would be before the dis-