*Arlene Q. Stevens, et al. v. Prettyman Manor Mobile Home Park Wastewater Treatment Plant*, No. 487, September Term, 2017.  Opinion filed on June 27, 2018, by Berger, J.


ENVIRONMENTAL LAW - DISCHARGE PERMITS - NOTICE AND COMMENT

We defer to MDE's reasonable interpretation of an ambiguous term in a statute that it administers.

ENVIRONMENTAL LAW - DISCHARGE PERMITS - NOTICE AND COMMENT

The term "application" in Env't Law § 1-603 and Env't Law § 9-324 is ambiguous as applied to a revised application.

ENVIRONMENTAL LAW - DISCHARGE PERMITS - NOTICE AND COMMENT

MDE reasonably interpreted the term "application" in Env't Law § 1-603 and Env't Law § 9-324 as encompassing an initial application and subsequent revisions "which do not substantially change the permitted activity."

ENVIRONMENTAL LAW - DISCHARGE PERMITS - NOTICE AND COMMENT

MDE was not required to publish a second notice of application after the appellant submitted a revised application where the changes were not substantial and did not prevent the public from participating in the permitting process.

ENVIRONMENTAL LAW - DISCHARGE PERMITS - JUDICIAL REVIEW

Appellants were barred from challenging the total suspended solids limit in an NPDES permit on appeal because they failed to raise the issue in the comment period.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 487

September Term, 2017

_____

ARLENE Q. STEVENS, ET AL.

v.

PRETTYMAN MANOR MOBILE HOME
PARK WASTEWATER TREATMENT
PLANT

_____

Berger,
Shaw Geter,
Sharer, J. Frederick
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed:  June 27, 2018

This case is an appeal from a judgment entered on judicial review of an administrative decision. In 2015, the Maryland Department of the Environment ("MDE") issued a permit ("the Permit") to Prettyman Manor, LLC ("Prettyman"), appellee, to discharge treated wastewater into Little Creek, a tributary of the Choptank River. Arlene Q. Stevens and Mildred Quidas (collectively, "Stevens and Quidas"), appellants, filed a petition for judicial review in the Circuit Court for Caroline County. The circuit court affirmed MDE's decision to issue the discharge permit.

On appeal, Stevens and Quidas present two questions for our review, which we have rephrased as follows:

1. Whether MDE failed to publish proper notice of Prettyman's application before issuing the Permit.

2. Whether the Permit allows an unlawful discharge of total suspended solids into an impaired water in violation of state and federal water quality standards.[1]

For the reasons explained herein, we shall affirm the judgment of the circuit court.

---

[1] In an appeal from a judgment entered on judicial review of an administrative decision, we review "the agency's decision, and not that of the circuit court." *Assateague Coastkeeper v. Maryland Dep't of Env't*, 200 Md. App. 665, 691 (2011). Accordingly, we have reframed the questions presented by Stevens and Quidas to focus on MDE's permit decision, rather than any alleged error on the part of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Regulatory Background**

     *A.     The Clean Water Act and the National Pollutant Discharge Elimination System*

Congress enacted the Clean Water Act ("the CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To this end, the CWA prohibits the discharge of any pollutant to waters of the United States without a permit issued through the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1251(a)(1); 33 U.S.C. § 1311(a); 33 U.S.C. § 1342(a)(1). The CWA requires that every NPDES permit contain

> (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and
>
> (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet "water quality standards."

*Piney See Run Preservation Ass'n v. Cnty. Commissioners of Carroll Cnty.*, 268 F.3d 255, 266 (4th Cir. 2001) (quoting *Am. Paper Inst., Inc. v. U.S. E.P.A.*, 996 F.2d 346, 349 (D.C. Cir. 1993)).

Pursuant to 33 U.S.C. § 1313(d), states are required to identify all waters within their respective boundaries where technology-based effluent limitations are inadequate to ensure that water quality standards are being met. For each impaired water, a state must establish a total maximum daily load ("TMDL") for every pollutant that is preventing the water from meeting water quality standards. 33 U.S.C. § 1313(d). Under 40 C.F.R. § 122.4(i), no permit may be issued "[t]o a new source or a new discharger, if the discharge

from its construction or operation will cause or contribute to the violation of water quality standards." When an applicant for an NPDES permit proposes to discharge a pollutant into an impaired body of water subject to a TMDL for that pollutant, the applicant must demonstrate that

> (1) [t]here are sufficient remaining pollutant load allocations to allow for the discharge; and
>
> (2) [t]he existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards. The Director may waive the submission of information by the new source or new discharger required by paragraph (i) of this section if the Director determines that the Director already has adequate information to evaluate the request.

40 C.F.R. § 122.4(i).

MDE is authorized to issue NPDES permits for discharges in Maryland. Maryland Code (1986, 2014 Repl. Vol., 2016 Supp.), § 9-324 of the Environment Article ("Env't"); *see also Piney See Run Preservation Ass'n*, *supra*, 268 F.3d at 266 (noting that "EPA has authorized approximately forty states, including Maryland, to issue NPDES permits"). When issuing NPDES permits for wastewater treatment plants ("WWTPs"), MDE must ensure that the proposed designs comply with technology-based effluent limitations as well as specific limitations for total suspended solids ("TSS"), biochemical oxygen demand, and pH levels. 40 C.F.R. § 133.100 *et seq*. Pursuant to 40 C.F.R. § 122.4(i), MDE must also ensure that a new discharge to an impaired body of water does not violate applicable TMDLs.

3

*B.* *Notice and Comment Procedures for NPDES Permits*

MDE is required to publish notice for each application for an NPDES permit. Env't § 1-603; Env't § 9-324. The notice of application must include the following information:

a) The name of the applicant;

b) The type of permit applied for;

c) The type of proposed discharge;

d) The volume of the proposed discharge;

e) The location of the proposed discharge;

f) A statement that persons may review and copy the application or related material and the procedure for doing so;

g) A statement that the Department shall hold an informational meeting, if a person makes a written request within 10 working days of the publication of the notice, and the procedure for requesting an informational meeting; and

h) Other information the Department determines is necessary for adequate public notification.

COMAR 26.08.04.01-1(D).

Upon receiving an application for an NPDES permit, MDE "shall prepare a tentative determination[.]" Env't § 1-604; COMAR 26.08.04.01-2(B)(1)(a). MDE must then publish -- or require the applicant to publish -- a notice of tentative determination that includes the following information:

(i)      The information in §B(1)(a) of this regulation;[2]

(ii)     The procedures for a person to review and copy the tentative determination, draft permit, or related material;

(iii)    A statement allowing 30 days for public comment to the notice of tentative determination before the issuance of the final determination and the procedures for offering public comment;

(iv)     A statement that the Department shall hold a public hearing when a written request for a public hearing is made within 20 days of the publication of the notice of tentative determination and the procedure for making a written request for a public hearing; and

(v)      Other information the Department considers necessary to ensure adequate public notice.

COMAR 26.08.04.01-2(B)(2)(b). After the public comment period closes, MDE may proceed to make a final determination and issue the permit. COMAR 26.08.04.01-3.

## II.      Factual and Procedural Background

Stevens and Quidas own two parcels in Preston, Maryland. One of the parcels is located at 3740 Frazier Neck Road, while the other is located at 21355 Marsh Creek Road. For more than fifty years, Stevens and Quidas have grown vegetables on their property (hereinafter "Quidas Farm") as their primary source of income. To irrigate their crops, Stevens and Quidas draw water from a retaining pond that they constructed by diverting water from Little Creek, a tidal tributary of the Choptank River. Maryland has identified

---

[2] This information includes, *inter alia*, "[a] proposal to issue or not issue the permit," "[t]he type, volume, and location of the proposed discharge," "[p]roposed permit limitations and conditions," and "[a] brief explanation of the Department's tentative decision." COMAR 26.08.04.01-2(B)(1)(a).

this segment of the Choptank River as impaired due to excess nitrogen, phosphorus, TSS, and other pollutants.

Directly across from Quidas Farm on Little Creek is a mobile home park ("Prettyman Manor") owned and operated by Prettyman. Located at 21269 Dover Bridge Road, Prettyman Manor has been home to dozens of families for decades. Over time, the sewage generated by the residents of Prettyman Manor has overwhelmed the park's aging septic tanks and drainfields. Eventually, MDE initiated an enforcement action, forcing Prettyman to pump and haul the sewage from the failing on-site disposal systems to a treatment facility in Dorchester County. Thereafter, Prettyman decided to build an on-site WWTP to service Prettyman Manor.

### A. *Prettyman's 2012 Application for a Discharge Permit*

In April of 2012, Prettyman submitted an application for a discharge permit to discharge treated wastewater from the proposed WWTP into Little Creek ("the 2012 Application"). According to the 2012 Application, the proposed facility would treat up to 40,000 gallons per day using extended aeration technology. MDE published notice of the 2012 Application in *The Times Record* on August 8, 2012 and August 15, 2012 ("the 2012 Notice"). MDE did not receive any requests for an informational meeting.

MDE quickly determined that the 2012 Application was not consistent with the Caroline County Water and Sewer Plan. On August 24, 2012, MDE gave Prettyman an update on the status of the 2012 Application:

> In reviewing your discharge permit application for the proposed Prettyman Manor WWTP, we have found that your proposal is not consistent with the Caroline County Water and

6

> Sewer Plan. We cannot issue a wastewater surface water discharge permit until the proposed facility is consistent with the county Plan and have suspended further processing of your application. However, to assist you in making a determination whether to proceed with the project, we will develop planning effluent limitations which are needed to estimate potential costs for the project.

In October of 2012, MDE helped Prettyman determine the best point of discharge for the proposed WWTP. In December of 2013, MDE met with Prettyman to discuss, among other things, the possibility of amending the Caroline County Water and Sewer Plan.

> B.     *Prettyman's 2014 Revised Application for a Discharge Permit*

On July 21, 2014, Prettyman submitted a revised permit application ("the 2014 Revision"). In the 2014 Revision, Prettyman proposed using a membrane bioreactor rather than extended aeration technology in order to meet MDE's enhanced nutrient removal standards. The new design also lowered the treatment capacity from 40,000 gallons per day to 20,000 gallons per day. Additionally, Prettyman changed the outfall location from the southwest corner of Prettyman Manor to the southeast portion of the property. MDE processed the 2012 Revision under the same NPDES number as the 2014 Application and did not publish a new notice of application.

Because Little Creek was impaired by excess amounts of phosphorus and nitrogen, MDE required Prettyman to secure offsets in the form of total nitrogen ("TN") credits and total phosphorus ("TP") credits. To obtain the necessary TN credits, Prettyman had to eliminate eighty on-site disposal systems. To obtain the necessary TP credits, Prettyman entered into a nutrient credit transfer agreement with the Town of Denton.

7

On February 5, 2015, MDE provided Prettyman with effluent limits for the purpose of planning the wastewater treatment system. That same month, the Caroline County Commissioners amended the Caroline County Water and Sewer Plan to authorize the treatment technology and discharge volume proposed in the 2014 Revision. On July 28, 2015, MDE notified Prettyman and other interested parties of its tentative determination to issue the Permit.

C.      *Tentative Determination, Comment Period, and Final Determination*

MDE published a notice of tentative determination in *The Times Record* on August 5, 2015 and August 12, 2015. The notice included the following information: (1) the location of the WWTP; (2) the water that would receive the discharge; (3) the effluent limits; (4) details of the nutrient credit agreement with the Town of Denton; (5) the deadline for requesting a public hearing; and (6) the deadline for submitting comments, which was September 4, 2015.

There was no request for a public hearing. On September 2, 2015, Stevens and Quidas sent a letter to MDE expressing their concern about the potential environmental impact of the project and requesting a meeting. MDE met with Stevens and Quidas on September 15, 2015. According to a letter from MDE to Prettyman's contractor, "[t]he neighboring farmers had concerns about potential bacterial contamination of their produce and they requested a few more days to take our proposed effluent bacterial limit and run it by their inspector before sending something in writing."

On September 27, 2015, Stevens and Quidas sent a letter to MDE with additional questions and comments. MDE responded on October 21, 2015 with a detailed letter

8

addressing each issue raised by Stevens and Quidas. Regarding the effect of the proposed WWTP on the Quidas Farm irrigation pond, MDE wrote the following:

> In addition, information of stage of the stream and wet trace observed during our site visit, and a Digital Elevation Model (DEM) (USGS, 2009) of Little Creek were analyzed to determine the tidal boundary of the Creek, and the runoff drainage pattern for the landscape above the proposed outfall location. The DEM indicates the tidal boundary is 670 ft upstream of the point of discharge. Given your property is 850 ft upstream from the proposed outfall location and the stream bed elevation beside your property is 3 ft above the stream bed elevation adjacent to the proposed outfall location, there is no reasonable potential the irrigation pond will be affected by the proposed discharge under normal circumstances (water profile modeled by HEC-RAS using DEM data, attachment pages 5-6).

MDE provided Prettyman with the final discharge permit on October 27, 2015 and published notice of its final determination in *The Times Record* on November 11, 2015 and November 18, 2015. On December 11, 2015, Stevens and Quidas filed a petition for judicial review in the Circuit Court for Caroline County.

### D. Judicial Review

The circuit court held a hearing on December 12, 2016. At the hearing, Stevens and Quidas argued that the Permit was invalid because MDE failed to publish notice of the 2014 Revision. Stevens and Quidas further argued that the Permit unlawfully allowed Prettyman to discharge TSS into a body of water already impaired by excess TSS levels without requiring any offsets. MDE argued that the 2012 Notice was sufficient and that Stevens and Quidas had waived any objection to the TSS limit specified in the Permit. In a memorandum opinion and order issued on March 22, 2017, the circuit court found that

9

MDE had "acted properly within its authority and did not err by granting the discharge permit in this matter[.]" Stevens and Quidas timely appealed.

## DISCUSSION

### I. Standard of Review

In reviewing a decision by MDE to issue a discharge permit, we apply the substantial evidence and arbitrary and capricious standards of review. *Maryland Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 118-19 (2016), *reconsideration denied* (May 20, 2016). In *Assateague Coastkeeper v. Maryland Dep't of Env't*, we explained the substantial evidence standard as follows:

> In applying the substantial evidence test, a reviewing court decides "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court "must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence.

200 Md. App. 665, 690 (2011) (quoting *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173-74 (2011)).

Under the arbitrary and capricious standard of review, we consider whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Anacostia*

10

*Riverkeeper*, *supra*, 447 Md. at 121 (quoting *Nat. Res. Def. Council v. U.S. E.P.A.*, 808 F.3d 556, 569 (2d Cir. 2015))

"When an agency resolves a question of law, however, our review is less deferential." *HNS Dev., LLC v. People's Counsel for Baltimore Cty.*, 425 Md. 436, 449 (2012)). "We refuse to uphold an agency decision 'premised solely upon an erroneous conclusion of law.'" *Anacostia Riverkeeper*, *supra*, 447 Md. at 122 (quoting *HNS Dev., LLC*, *supra*, 425 Md. at 449). Nevertheless, we give deference to an administrative agency's interpretation of the law in certain cases:

> Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is not to "substitute its judgment for the expertise of those persons who constitute the administrative agency." Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected.

*Assateague Coastkeeper*, *supra*, 200 Md. App. at 690-91 (quoting *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173-74 (2011)).

## II.     MDE Was Not Required to Publish Notice of the 2014 Revision

MDE acknowledges that it did not publish notice upon receiving Prettyman's 2014 Revision. MDE argues, however, that the 2014 Revision was not a new application, but merely a revised version of the 2012 Application. Stevens and Quidas, on the other hand, assert that the 2014 Revision and the 2012 Application were "materially different" and

11

that, consequently, each plan required a separate public notice.[3] The question before us, therefore, is whether the 2014 Revision and the 2012 Application constitute a single "application" under Maryland law. We hold that MDE's interpretation of the notice requirement is both reasonable and consistent with the CWA's goal of public participation.

### A. *MDE's Interpretation of the Notice Requirement Is Reasonable*

MDE argues that "the regulation does not require the Department to continually provide updates about revisions to a permit application, which do not substantially change the permitted activity, prior to the Department's issuance of a tentative determination." Although the underlying statutes and regulations are ambiguous on this point, we will not substitute our judgment for MDE's reasonable interpretation of the notice requirement.

Under Env't § 1-603, MDE "shall cause to be published notice of applications for [discharge] permits." Likewise, Env't § 9-324 provides that MDE "shall give public notice of each application for a discharge permit as required by Title 1, Subtitle 6 of this article, and by making available to the public appropriate documents, permit applications, supporting material, plans, and other relevant information." "After the Department receives the discharge permit application, the Department shall prepare a tentative determination[.]" Env't § 1-604; COMAR 26.08.04.01-2(B)(1)(a). Neither the statutes nor the regulations address whether a revised application should be treated as a new

_____

[3] Stevens and Quidas further argue that, prior to issuing the Permit, MDE allowed Prettyman to construct a pipe that would result in a different outfall location. Assuming *arguendo* that the actual outfall location differs from the location specified in the Permit, such a discrepancy would be an issue of compliance rather than grounds for challenging the Permit.

application for the purposes of the notice requirement.  We must turn, therefore, to statutory construction.

The "cardinal rule" of statutory construction is "to ascertain and effectuate the intent of the Legislature." *Assateague Coastkeeper*, *supra*, 200 Md. App. at 708-09 (quoting *Headen v. Motor Vehicle Admin.*, 418 Md. 559, 569 (2011)).  "If, after considering the plain language in its ordinary and common sense meaning, two or more equally plausible interpretations arise, however, then the general purpose, legislative history, and language of the act as a whole is examined in an effort to clarify the ambiguity." *Id.* at 709 (quoting *Wal Mart Stores, Inc. v. Holmes*, 416 Md. 346, 359 (2010)).  "When applying these rules of statutory construction, we give deference to an administrative agency's interpretation of the statutes it administers." *Headen v. Motor Vehicle Admin.*, 418 Md. 559, 570 (2011).

Our decision in *Assateague Coastkeeper v. Maryland Dep't of Env't* clarifies the proper role of agency deference in matters of statutory construction.  In that case, an environmental group challenged an NPDES permit for animal feeding operations in Maryland. *Assateague Coastkeeper*, *supra*, 200 Md. App. at 680-83.  The basis of the challenge was that the permit violated 40 CFR § 122.4(i), which prohibits the issuance of a permit "[t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards." *Id.* at 704-05.  MDE argued that a net reduction in the pollutant due to offsets should be considered in determining whether a new discharger "causes or contributes" to a violation of water quality standards. *Id.* at 706.  In affirming MDE's decision to issue the permit, we determined that the phrase "cause or contribute" was "susceptible to two or more equally

13

plausible interpretations." *Id.* at 710 (citations and quotation marks omitted). Recognizing that MDE is tasked with "administering federal regulations regarding water quality standards," we held that MDE's construction of 40 C.F.R. § 122.4(i) was "reasonable." *Id.* at 713-14. Accordingly, we declined to "substitute our judgment for that of the agency." *Id.* at 714.

Turning to the case at hand, the word "application" in the statutes and regulations is ambiguous in the context of a revised application. Notably, the General Assembly left the word undefined. In general usage, an application is a "request or petition" or "a form used in making a request." Application, Black's Law Dictionary (10th ed. 2014); Application, https://www.merriam-webster.com/dictionary/application. According to this definition, an "application" could plausibly encompass both an initial request and subsequent revisions to that request; just as plausibly, each subsequent revision could be considered an entirely new "application." We conclude, therefore, that the notice requirement as applied to revised applications is "susceptible to two or more equally plausible interpretations."

Inasmuch as the notice requirement is ambiguous, we give considerable weight to MDE's reasonable construction of that requirement. The General Assembly has explicitly tasked MDE with administering the NPDES permit process in Maryland, including the notice-and-comment requirements. Env't § 9-324; Env't 1-601 *et seq*. Indeed, MDE is uniquely situated to determine whether a particular interpretation of the notice-and-comment requirements would be practically feasible and consistent with the agency's overall mission. MDE may be wary of delays that would arise if every minor revision of an application were to reset the process to the very beginning. Each revised application, in

turn, could lead to more revisions, and so on *ad absurdum*. Additionally, MDE can reasonably expect a certain amount of flexibility in processing permits that implicate competing interests among local communities. In the case at hand, for example, MDE had determined that the replacement of the failing septic system was an urgent matter "for the health and well being of the residents" of Prettyman Manor. We will defer, therefore, to MDE's expertise in the NPDES permit process.

In light of MDE's expertise, we hold that MDE's construction of the notice requirement is reasonable. Indeed, the parties appear to be roughly in agreement as to the appropriate standard for determining when a new notice of application is needed. According to MDE, a new notice of application is unnecessary if the revisions "do not substantially change the permitted activity"; Stevens and Quidas, on the other hand, assert that a new notice is required if the revised plan is "materially different." MDE's "substantial change" standard is consistent with *Proffitt v. Rohm & Haas*, in which the U.S. Court of Appeals for the Third Circuit held that an amendment to an existing NPDES permit requires public notice if the amendment "effects a substantial change in the terms of the permit." 850 F.2d 1007, 1012-13 (3d Cir. 1988).[4] We hold, therefore, that MDE

---

[4] Because *Proffit* involved an amendment to an existing permit, rather than a revision to a pending application, it is not directly on point. EPA and state agencies may have greater flexibility in publishing notices of application, so long as the notice of tentative determination and subsequent comment period provide an adequate avenue of public participation. The court in *Proffitt* was particularly concerned that EPA had amended the NPDES permit without a public hearing or any opportunity for public participation. *Supra*, 850 F.2d at 1012. Here, Stevens and Quidas had notice of the thirty-day comment period, met with MDE, made comments on the 2014 Revision, and received a detailed response.

reasonably interpreted the term "application" in Env't § 1-603, Env't § 9-324, and the related regulations as encompassing an initial application and subsequent revisions "which do not substantially change the permitted activity."

B. *The Procedures Followed by MDE Were Consistent with CWA's Overall Policy of Public Participation*

We must now turn to the question of whether the 2014 Revision did, in fact, represent a substantial change to the permitted activity. In undertaking this inquiry, we are guided by the CWA's emphasis on public participation:

> Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

33 U.S.C. § 1251(e); *see Anacostia Riverkeeper*, *supra*, 447 Md. at 179 (rejecting a procedural challenge to an NPDES permit because MDE's actions were consistent with 33.U.S.C. § 1251(e)). We hold that the changes in the 2014 Revision were minor and they did not prevent Stevens and Quidas from fully participating in the permitting process.

The 2012 Notice published by MDE included the following information:

> The Department will hold an informational meeting to discuss any of the following discharge permit applications and the permit review process if a written request is received by the date specified below.
>
> [. . .]
>
> If you wish to be notified of further action concerning any of the permit applications listed below, please call Mr.

16

> Richardson or Mr. Cheng at the above telephone number and request placement on the **individual** mailing list for that permit.
>
> [. . .]
>
> **State Discharge Permit Application 12-DP-3779, NPDES Permit MD0071552:**
> Mr. Franklin W. Prettyman, Owner, 21269 Dover Bridge, Rd., Preston, MD 21655 applied for a new permit to discharge an average of 40,000 gallons per day of treated domestic wastewater from the Prettyman Manor Mobile Home Park Wastewater Treatment Plant located at 21269 Dover Bridge Rd. #6, in Preston, MD 21655 to Little Creek.
> **Publication Dates:  August 8 and 15, 2012**
> **Meeting Deadline:  August 22, 2012**

Stevens and Quidas argue that this notice was not sufficient to apprise affected residents of the permit that was ultimately granted.  We disagree.

Although the volume and location of the discharge changed somewhat between 2012 and 2014, these changes fell within the scope of the 2012 Notice.  The effluent discharge in the 2014 Revision was actually *decreased* from 40,000 gallons per day to 20,000 gallons per day.  Given that nearby residents were already on notice of a proposed discharge of up to 40,000 gallons per day, they could not have been surprised that the Permit allowed a discharge within that range.  More broadly, the change in the discharge volume did not result in an increased environmental impact that would warrant additional notice.

Stevens and Quidas argue that the "location of the outfall structure as proposed in 2012 was materially different than the location selected, and ultimately permitted, in the 2014 application."  Notably, the 2012 Notice stated only that the proposed facility would

17

discharge effluents "to Little Creek."  Although the precise point of discharge was moved

to a different part of Prettyman's property, the body of water receiving the discharge --

Little Creek -- remained the same.[5]  Further, there is nothing in the record to suggest that

the new point of discharge would significantly change the environmental impact of the

permitted activity.[6]  We, therefore, conclude that the change in discharge location did not

deprive the public of a fair opportunity to participate in the process.

Stevens and Quidas claim that the 2012 Application was "wholly abandoned."  The

record shows, however, that MDE did not reject the 2012 Application.  Instead, MDE

informed Prettyman that it would not issue a permit "until the proposed facility is consistent

with the county Plan[.]"  Although MDE "suspended further processing" of the 2012

Application, MDE continued to work with Prettyman in 2012 and 2013 to bring the plan

into compliance.

Stevens and Quidas stress that "three (3) full years" passed between 2012 Notice

and the notice of tentative determination in 2015.  While this is true, the 2012 Notice made

---

[5] It is likely that an additional public notice for the 2014 Revision would have listed "Little Creek" as the location of discharge.  Stevens and Quidas contend that a notice of application must include the "point of discharge," which is defined as "that location in or adjacent to a body of water at which any liquid, solid, or gaseous substances are discharged or deposited."  COMAR 26.08.01.01(B)(64).  Significantly, COMAR 26.08.04.01-1(D) refers to "the location of the discharge" rather than "point of discharge."  This distinction is reflected in the format of the 2012 Notice, which listed the general body of water that would receive the discharge, rather than the exact coordinates.

[6] Stevens and Quidas assert that the new point of discharge is "far worse" than the old one.  In both the 2012 Application and the 2014 Revision, however, the point of discharge is *downstream* of the Quidas Farm irrigation pond.  MDE found that "there is no reasonable potential the irrigation pond will be affected by the proposed discharge under normal circumstances."

18

it clear that members of the public could ask "to be notified of further action" concerning the application. Critically, Stevens and Quidas did not sign up for these notifications. Had they done so, MDE would likely have alerted them to the 2014 Revision. Further, MDE did not receive any request for an informational meeting after it published the 2012 Notice. If residents were not alarmed by the 2012 Application, it is unclear why they would suddenly be spurred into action by the 2014 Revision, which drastically cut the effluent discharge.

Although MDE did not publish notice of the 2014 Revision, the 2012 Notice and the notice of tentative determination published in 2014 were sufficient to place Stevens and Quidas on notice of the proposed discharge. Indeed, MDE went beyond the statutory requirements in ensuring that Stevens and Quidas had an opportunity to participate. MDE held an informational meeting with Stevens and Quidas even though their request was untimely.[7] MDE further accommodated Stevens and Quidas by responding to their September 27, 2015 letter, even though, as we explain *infra*, the comment period closed on September 4, 2015. More broadly, the outcome of this particular proceeding -- a permit with more stringent standards than those proposed in the initial application -- is the expected and desired outcome of the public comment process. Accordingly, we reject Stevens's and Quidas's contention that such an outcome is proof that the process was flawed. We hold, therefore, that MDE "provided for, encouraged, and assisted" public participation as Congress envisioned. 33 U.S.C. § 1251(e).

---

[7] An informational meeting must be requested within ten working days of the notice of application. COMAR 26.08.04.01-2(A).

19

**III.    Stevens and Quidas Waived Any Objection to the TSS Limits in the Permit**

Stevens and Quidas argue that the TSS effluent limitation established in the Permit violates 40 C.F.R. § 122.4(i), which prohibits the issuance of a permit "[t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."  MDE responds that "[p]etitioners are prohibited from raising this issue on appeal . . . because they failed to raise it during the public comment period."  We agree with MDE.

Judicial review of a permit decision by MDE is "on the administrative record and limited to objections raised during the public comment" unless one of the following exceptions applies:

> (i)    The objections were not reasonably ascertainable during the comment period; or
>
> (ii)   Grounds for the objections arose after the comment period.

Env't § 1-601.  The comment period extends for thirty days after the first notice of tentative determination is published.  Env't § 1-604.  This limitation on judicial review is consistent with the rule that "a court ordinarily may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency."  *Zakwieia v. Baltimore Cty., Bd. of Educ.*, 231 Md. App. 644, 649-50 (2017), *cert. denied sub nom. Zakwieia v. Baltimore Co. Bd. of Educ.*, 454 Md. 676 (2017).

In the present case, MDE published its first notice of tentative determination on August 5, 2015.  The comment period ended, consequently, on September 4, 2015.  The

20

only comment made by Stevens and Quidas during this period was a letter, dated September 2, 2015, in which Stevens and Quidas expressed some general concerns and requested a meeting with MDE:

> My family and I are property owners on Little Creek in Caroline County and use it as a water source for irrigation of vegetables and other agricultural products. We have concerns with effects the proposed influx of treated wastewater and nutrients may have in the future. We believe the potential exists for detrimental environmental impact. As farmers and family members who are income dependent on growing crops, including some for human consumption, a major concern is possible economic consequences this proposal may have on our business.
>
> [. . .]
>
> I would appreciate meeting with you regarding this matter. Please contact me at the above cell phone number at your earlier convenience.

Although Stevens and Quidas followed up with specific objections in a letter dated September 27, 2015, these objections were not made within the comment period.

The September 2, 2015 letter was not sufficient to put MDE on notice that Stevens and Quidas would object to the TSS limit specified in the Permit. Critically, the September 2, 2015 letter does not raise any concrete objections to the proposed WWTP. Although Stevens and Quidas referred generally to "the proposed influx of treated wastewater and nutrients," their concerns were couched in broad and indefinite language. Stevens and Quidas were worried about "effects the proposed influx . . . *may have in the future*," the "*potential* . . . for detrimental impact," and "*possible* economic consequences" (emphasis added). The September 2, 2015 letter evinced no particular knowledge of the details of

21

either the 2012 Application or the 2014 Revision. The lack of detail and concluding request for a meeting indicate that, as of September 2, 2015, Stevens and Quidas were primarily seeking to learn more about the project, rather than to lodge a substantive objection grounded in the specifics of the project.

Because the TSS issue was not properly raised in the comment period, we do not have a complete administrative record that would support a review on the merits. MDE claims that offsets for TSS levels were unnecessary in light of the expected overall reduction of TSS levels under Maryland's Phase II Watershed Implementation Plan for the Chesapeake Bay TMDL ("WIP II"). Stevens and Quidas correctly point out that WIP II is not part of the record. The dispute over WIP II only underscores our conclusion that the record concerning the TSS levels was not properly developed prior to judicial review.

The record clearly demonstrates that MDE did not merely "rubber stamp" Prettyman's application; instead, MDE worked with Prettyman for three years to bring its application into compliance. Among other things, MDE required Prettyman to offset the expected levels of phosphorus and nitrogen in the WWTP discharge by eliminating eighty on-site disposal systems and entering into a "nutrient transfer agreement" with the Town of Denton. MDE held an informational meeting with Stevens and Quidas and provided a detailed response to their untimely comment letter. Had Stevens and Quidas properly raised the TSS issue, MDE would have had an opportunity to revise the Permit or, at the very least, to explain its decision, as it did for every other objection raised by Stevens and Quidas.

Stevens and Quidas argue that a neighboring farm family will not necessarily "command the same grasp of the technical jargon employed in the Clean Water Act, State statutes[,] and implementing regulations as only private experts, environmental attorneys, and the agency itself would have [done]."[8]  Nevertheless, we cannot review an administrative decision without a fully-developed record.  The general concerns voiced by Stevens and Quidas during the comment period were insufficient to generate such a record.  We do not fault Stevens and Quidas for failing to use "technical jargon."  Stevens and Quidas may not, however, recast a request for an informational meeting as an all-purpose objection preserving every issue they wish to raise.

Stevens and Quidas argue that the procedural bar of Env't § 1-601 does not apply here because the TSS issue "[was] not reasonably ascertainable during the comment period." We disagree.  As we explain *supra*, the 2012 Notice was sufficient to apprise concerned residents of the discharge permit that was ultimately issued in 2014.  Furthermore, the 2014 Revision imposed the same TSS limit as the 2012 Application.  Stevens and Quidas had nearly three years to review the TSS limit, study the relevant statutes and regulations governing TSS levels, and formulate a specific objection to the Permit on that basis.  If Stevens and Quidas had questions about the TSS limit, they could have requested an informational meeting in 2012.  If the 2014 Revision gave rise to additional questions, Stevens and Quidas could have requested a public hearing.  In short,

---

[8] We note, however, that Stevens and Quidas demonstrated in their September 27, 2015 letter to MDE that they are quite capable of articulating detailed and specific challenges to an NPDES permit application.

23

Stevens and Quidas had ample opportunity to ascertain potential issues related to the TSS limit, but they failed to do so. We hold, therefore, that the TSS issue has been waived.

The only question preserved for our review is whether MDE was required to publish a second notice of application for the 2014 Revision. For the foregoing reasons, we hold that MDE reasonably dispensed with the second notice of application, and that MDE's actions were consistent with the need to ensure public participation in the NPDES permit process. We, therefore, affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR CAROLINE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**